AO 91 (Rev. 11/11) Criminal Complaint                            AUSA Davis Shugrue (312) 353-1980



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NUMBER: 26 CR 348

TRAVIS SMITH                                **UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about March 1, 2026, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Did knowingly and intentionally distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of fentanyl, a Schedule II Controlled Substance. |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

*Dante Koeppen*

Dante Koeppen
Special Agent, Homeland Security Investigations

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: June 30, 2026

*Laura K. McNally*
*Judge's signature*

City and state: Chicago, Illinois                Hon. Laura K. McNally, U.S. Magistrate Judge
                                                 *Printed name and title*

| UNITED STATES DISTRICT COURT | |
|---|---|
| | ss |
| NORTHERN DISTRICT OF ILLINOIS | |

## **AFFIDAVIT**

I, Dante Koeppen, being duly sworn, state as follows:

1. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), and have been so employed since approximately 2023.

2. As part of my duties as an HSI Special Agent, I investigate criminal violations relating to narcotics trafficking and money laundering offenses, including, but not limited to, Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963, and Title 18, United States Code, Sections 1956 and 1957. I have been involved with various electronic surveillance methods, as well as the debriefing of defendants, informants, and witnesses, and others who have knowledge of the distribution, transportation, storage and importation of controlled substances.

3. I have received training in the areas of narcotics investigations, money laundering, financial investigations, and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

4. This affidavit is submitted in support of a criminal complaint alleging that TRAVIS SMITH has violated Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing

probable cause in support of a criminal complaint charging SMITH with distribution of a controlled substance, namely, a quantity of a mixture or substance containing a detectable amount of fentanyl, a Schedule II Controlled Substance, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

5.      This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, consensually recorded communications, recordings of controlled transactions involving SMITH, my experience and training, and the experience of other law enforcement agents.

## I.      FACTS SUPPORTING PROBABLE CAUSE

### A.      Summary of Probable Cause

6.      Since approximately September 2024, law enforcement, including HSI, the Chicago Police Department ("CPD"), and the Internal Revenue Service – Criminal Investigation ("IRS-CI") have been investigating a drug trafficking organization ("DTO") that distributes narcotics on the west side of Chicago, including near the intersection of W. Chicago Ave. and North St. Louis Ave. ("The Block"). As described in more detail below, law enforcement officers have conducted approximately seven controlled purchases of suspected narcotics from Travis SMITH[1] at or around The Block.

---

[1] Law enforcement initially identified SMITH based on the following facts: According to law enforcement reports, on January 7, 2026, an undercover law enforcement officer conducted a hand-to-hand controlled narcotics purchase with an unknown subject. Following the transaction, law enforcement officers conducted surveillance of the unknown subject and

7.     Specifically, according to law enforcement reports, an undercover law enforcement officer ("UC-4") conducted controlled purchases of fentanyl[2] from SMITH on the following dates and in the following amounts below:

| January 7, 2026 | 6.9 grams |
|---|---|
| January 11, 2026 | 2.4 grams |
| February 20, 2026 | 4.6 grams |
| March 1, 2026 | 5.6 grams |
| March 15, 2026 | 5.3 grams |
| March 20, 2026 | 6.0 grams |
| April 29, 2026 | 4.0 grams |

**B.     March 1, 2026, SMITH Sold 5.6 Grams of Fentanyl to UC-4**

8.     On or about March 1, 2026, according to law enforcement reports, law enforcement formulated a plan to conduct a controlled purchase of narcotics utilizing an undercover law enforcement officer, UC-4, at or near the 700 block of North St. Louis Avenue (The Block).   UC-4 was equipped with audio and video recording equipment, which captured the controlled narcotics purchase.   Prior to UC-4 proceeding to The Block, other law enforcement officers ("surveilling officers") established mobile surveillance of the area of The Block while other law enforcement officers observed pole cameras or police observation device ("POD") cameras in the area of The Block.   At approximately 10:13 a.m., surveilling officers observed an

---

then conducted an investigatory traffic stop of the unknown subject.   Officers identified SMITH as the unknown subject through the Illinois state identification card he provided and a comparison of the identification photograph to his physical appearance.

[2] According to law enforcement reports, in each instance the recovered substance was sent to the Illinois State Police Crime Lab for analysis.   According to lab reports, in each instance a sample of the recovered substance tested positive for fentanyl.

individual later identified (as described in additional detail below) as SMITH walking southbound on the 700 block of North St. Louis Avenue.

9. According to law enforcement reports, surveilling officers observed SMITH and an unknown individual ("UNK-1") walk to the north-west corner of West Huron Street and North St. Louis Avenue at approximately 10:13 a.m. Law enforcement officers maintained intermittent surveillance on SMITH. At approximately 10:44 a.m., surveilling officers observed SMITH and UNK-1 still standing near the same area. At approximately 10:46 a.m., SMITH began walking, by himself, northbound on the west sidewalk abutting North St. Louis Avenue.

10. According to UC-4, at approximately the same time, UC-4 observed SMITH at approximately 712 North St. Louis Avenue. Although SMITH was wearing a face covering that partially concealed his face, UC-4 recognized SMITH from the January 7, January 11, and February 20 purchases that UC-4 had conducted with SMITH (listed in the chart above) based on the portions of SMITH's face that were visible as well as SMITH's voice.[3]

11. According to UC-4 and UC-4's recording of the transaction, SMITH looked in the direction of UC-4 and stated "what up, bro" [4] to which UC-4 responded

---

[3] According to law enforcement reports, after the January 7, 2026, controlled transaction, UC-4 identified SMITH in a six-pack photo lineup. UC-4 did not conduct a separate lineup after the March 1 controlled transaction.

[4] This affidavit does not describe every communication between SMITH and UC-4 or every communication by SMITH that UC-4 observed. My descriptions of certain recorded communications are summaries of the communications and may not include the entirety of the communications. Where recorded conversations are discussed in this affidavit, the language that is quoted from the recorded conversations is based upon a preliminary review and draft transcripts of the recorded conversations and not on final transcripts of the recorded conversations. These summaries and excerpts do not necessarily include all

by saying "six." UC-4 continued to walk toward SMITH. SMITH proceeded to yell out to another unknown customer (UNK-2) "how many [bags of narcotics]?" UNK-2 responded to SMITH by saying words to the effect of, "one." UC-4 observed SMITH enter a vacant lot, bend over near some debris, and reach under a tree branch and retrieve numerous pink-tinted plastic zip-loc bags that were bundled together with a rubber-band.[5] UC-4 observed SMITH stand up and proceed to count out and remove from the bundle six pink-tinted plastic zip-loc bags each containing a gray powder substance. UC-4 then approached SMITH inside the vacant lot. SMITH handed the six pink-tinted zip-loc bags to UC-4. UC-4 gave SMITH three twenty-dollar bills.

12. According to UC-4 and video of the interaction, after the controlled purchase, UC-4 observed SMITH engage in a hand-to-hand narcotics transaction with UNK-2. Specifically, UC-4 observed SMITH tender a single, pink-tinted plastic zip-loc bag and receive an unknown amount of United States currency.

13. According to law enforcement reports, the controlled transaction between SMITH and UC-4 occurred at approximately 10:47 a.m.

---

statements or topics discussed during the course of the recorded conversations, nor do quotes summarized in succession necessarily reflect all statements made between the quotes. Any times listed for communications are approximate. At various points in the affidavit, I have included, either in brackets or summary form, my interpretation of words and phrases used in the recorded communications. My interpretations are based on the contents and context of the recorded communications, events occurring before and after the communications, my knowledge of the investigation as a whole, my experience and training, and the experience of other law enforcement agents.

[5] According to law enforcement reports, surveilling officers observed SMITH walk into a vacant lot, at approximately 714 North St. Louis Avenue and bend over and retrieve items from the ground. Surveilling officers observed UC-4 approach SMITH and conduct what appeared to be based on their training and experience and the context of the investigation a hand-to-hand narcotics transaction.

14. According to law enforcement reports, after completing another controlled narcotics purchase from a different individual, UC-4 waited until it was safe and feasible and then relayed a synopsis of the controlled purchase from SMITH, a description of SMITH, and SMITH's last known location.

15. According to law enforcement reports, surveilling officers observed SMITH intermittently via surveillance camera after the transaction described above. Surveilling officers observed SMITH walk out of camera view southbound along North St. Louis Avenue at approximately 10:48 a.m. At approximately 11:04 a.m., surveilling officers observed SMITH return into camera view walking northbound on North St. Louis Avenue. At approximately 11:14 a.m., surveilling officers observed SMITH on camera at the northwest corner of North St. Louis Avenue and West Huron Street. At approximately 11:18 a.m., surveilling officers observed SMITH on camera leaving the corner of North St. Louis Avenue and West Huron Street walking southeast. At approximately 11:19 a.m., surveilling officers observed SMITH on camera walking eastbound along West Huron Street. At that time, surveilling officers observed SMITH remove his mask, which was captured on recorded video.

16. According to law enforcement reports, one of the surveilling officers observing SMITH on camera recognized SMITH because the officer participated in the January 7, 2026, investigatory stop detailed above.

17. According to law enforcement reports, surveilling officers saw SMITH turn northbound from West Huron Street onto the 700 block of North Trumbull Avenue and enter the yard of a residential building on that block at approximately

11:20 a.m. Surveilling officers observed SMITH leave the yard at approximately 11:23 a.m. and walk southbound on Trumbull, crossing Huron Street onto the 600 block of North Trumbull Avenue.

18. According to law enforcement reports, surveilling officers watching SMITH on video relayed SMITH's description and location to other law enforcement officers in the area of the 600 block of North Trumbull Avenue. According to law enforcement reports, the relayed description was of a black male wearing a black hat, black facemask, black coat, and black pants.

19. According to law enforcement reports, a surveillance officer present in the area observed SMITH walk into a residence on the 500 block of North Trumbull Avenue at approximately 11:27 a.m. and relayed this information to other law enforcement officers so they could perform an investigatory stop.

20. According to law enforcement reports, law enforcement officers stopped SMITH based on the relayed description in the front yard of 532 North Trumbull Avenue at approximately 11:27 a.m.[6] One of those officers had also participated in the January 7, 2026, investigatory stop of SMITH and recognized SMITH from that previous interaction with SMITH. According to law enforcement reports and body-worn camera footage, when officers stopped SMITH, SMITH removed his mask and stated to officers words to the effect of "you know me" and "I'm Travis Smith." When

---

[6] According to publicly available maps, 532 N. Trumbull Ave. is approximately two blocks South and one block East of the 700 block of North St. Louis Ave.

A Chicago Police Department Stop Report incorrectly lists the time of this stop as 12:40 to 12:44. Other law enforcement reports and the timestamp on the body-worn camera footage from this stop confirm that it occurred at approximately 11:27 a.m.

law enforcement officers asked SMITH for his identification, he told officers he did not have it.

21.     According to law enforcement reports, the six pink-tinted plastic zip-loc bags containing a gray powder substance that UC-4 received from SMITH were sent to the Illinois State Police Crime Lab for testing and analysis. According to lab reports, the bags weighed approximately 7.4 grams, including packaging. According to lab reports, the lab tested a sample of the contents of the bags, and testing indicated the presence of fentanyl. According to lab reports, the total amount of gray powder substance, not including packaging, was approximately 5.6 grams.

22.     Based on the foregoing, I respectfully submit that there is probable cause to believe that on or about March 1, 2026, SMITH distributed a controlled substance, namely, a quantity of a mixture or substance containing a detectable amount of fentanyl, a Schedule II Controlled Substance.

FURTHER AFFIANT SAYETH NOT.

*Dante Koeppen*

DANTE KOEPPEN
Special Agent, Homeland Security
Investigations

SWORN TO AND AFFIRMED by telephone June 30, 2026.

*Laura K. McNally*

Honorable Laura K. McNally
United States Magistrate Judge

8